# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

EMMETT L. BENNETT,      )
                            )
       Plaintiff,          )
                            )
      v.                   )       **CAUSE NO. 1:13-cv-00327-SLC**
                            )
**COMMISSIONER OF SOCIAL**    )
**SECURITY, sued as Carolyn W. Colvin,**   )
**Acting Commissioner of Social Security,**   )
                            )
       Defendant.       )

## OPINION AND ORDER

Plaintiff Emmett L. Bennett appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Bennett applied for DIB and SSI in October 2010, alleging disability as of October 10, 2009. (DE 11 Administrative Record ("AR") 194-205). The Commissioner denied Bennett's application initially and upon reconsideration. (AR 101-15). After a timely request, a hearing was held on February 17, 2012, before Administrative Law Judge Warnecke Miller ("the ALJ"), at which Bennett, who was represented by counsel; Bennett's sister; and a vocational expert

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

testified.  (AR 7-65).  On May 29, 2012, the ALJ rendered an unfavorable decision to Bennett, concluding that he was not disabled because despite the limitations caused by his impairments, he could still perform his past relevant work as a machine feeder, as well as a significant number of other jobs in the economy.  (AR 75-90).  The Appeals Council denied his request for review (AR 1-6, 66-74, 326-55), at which point the ALJ's decision became the final decision of the Commissioner.  *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); 20 C.F.R. §§ 404.981, 416.1481.

Bennett filed a complaint with this Court on November 15, 2013, seeking relief from the Commissioner's final decision.  (DE 1).  In this appeal, Bennett alleges that the ALJ improperly evaluated the opinions of several doctors of record, as well as the opinions of his treating psychiatric nurse and mental health case worker.  (DE 19 at 17-25).

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Bennett was 49 years old (AR 194); had a ninth grade education without special education classes (AR 236); and had past relevant work experience as a machine feeder and material handler (AR 88, 237, 242).  In 2003, Bennett was laid off from his factory job at Halex, where he had worked for 16 years.  (AR 227-29, 237, 242).  He alleges disability due to the following impairments: major depressive disorder, recurrent, severe without psychotic features; intermittent explosive disorder; borderline intellectual functioning; obesity; and minimal degenerative changes in the MP joint of his left great toe.  (DE 19 at 2).  Because Bennett does not challenge the ALJ's findings about his physical condition (DE 19 at 2 n.1), the

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 712-page administrative record necessary to the decision.

Court will focus on the evidence pertaining to his mental limitations.

## B. Bennett's Testimony at the Hearing

At the hearing, Bennett testified that he lives independently in a subsidized apartment. (AR 26). Bennett said that in a typical day, he cooks his meals and cleans his apartment, but otherwise "mostly just sit[s] around." (AR 26-27). He rides his bicycle around town for several hours each day to collect cans, and then exchanges them at the recycling center for cash; sometimes he rides to the grocery or to visit his sister. (AR 27-29, 31-32). He stated that he used to have a problem with drugs and alcohol, but had not used these substances in the past five years. (AR 32).

Bennett testified that his depression affects his sleep; sometimes he wants to sleep all day and other times he cannot sleep at all. (AR 26, 35). He asserted that he has had depression all of his life and that it has caused him to miss work in the past. (AR 34). He estimated that if he had a full-time job now, he would miss three or four days a month due to his mental symptoms. (AR 35).

Bennett's sister also testified at the hearing, essentially corroborating his testimony. (AR 36-40). She added that Bennett is very temperamental, moody, and hard to deal with at times, which causes him problems when interacting with others. (AR 37-39). She also stated that he is very trusting and wants to please others, but he gets very upset if he fails to do so. (AR 38-39).

## C. Summary of the Relevant Medical Evidence

In August 2004, Bennett was referred to the Northeastern Center after he was charged with domestic battery; he was unemployed at the time and separated from his wife. (AR 708). He was assigned a Global Assessment of Functioning ("GAF") score of 35 on admission and

diagnosed with alcohol dependence and adjustment disorder with mixed anxiety and depression.[3] (AR 708). He satisfactorily completed an anger management program in December 2004; in early 2005, he reported that he had stopped using alcohol, was controlling his anger, was staying calm with medication, and that his mood was good. (AR 367). A note dated February 17, 2005, indicated that he had been looking for work, but was unsuccessful. (AR 367).

In February 2009, Bennett was hospitalized at the Northeastern Center after he jumped out of a moving car; this was his third suicide attempt in the past week, as he had also attempted to overdose on medications. (AR 387). He was in the process of getting a divorce. (AR 387). On a mental status exam, Bennett was disheveled with some slurred speech; he had trouble remembering names, and his judgment was very poor. (AR 387). He was diagnosed with mood disorder, not otherwise specified ("NOS"); possible impulse control disorder; alcohol dependence in remission; and possible borderline intellectual functioning or mild mental retardation. (AR 387). He was assigned a GAF score of 40 on admission and 55 upon discharge. (AR 387).

On October 12, 2010, Bennett was evaluated by clinician Juliette Kacines at Park Center.

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Revision, 4th ed. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.* A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Bennett, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

(AR 440-47). He presented with irritability, poor concentration, and poor decision making; he stated that he threatens suicide when angry or upset but does not mean it. (AR 440, 443). He was currently looking for a job, but his emotional dysregulation had interfered with past employment. (AR 442). Ms. Kacines found that Bennett was agitated and had some memory problems. (AR 446). She assigned him a GAF of 46 and diagnoses of major depressive disorder, recurrent, severe without psychotic features; intermittent explosive disorder; alcohol dependence; and mild mental retardation. (AR 446).

Two weeks later, Dr. Ronald Pancner evaluated Bennett at Park Center; Bennett was homeless at the time. (AR 449-51). He presented with complaints of depression, agitation, anxiety, and some memory problems. (AR 449-50). Dr. Pancner prescribed Celexa and suggested vocational rehabilitation. (AR 451). He assigned the same diagnoses as Ms. Kacines, although he questioned the diagnosis of mild mental retardation. (AR 450-51).

Bennett participated in case management and counseling services at Park Center from October 2010 to March 2012. He met with a case manager or therapist approximately 59 times. (AR 420-51; 487-538; 541-609; 624-97). On November 17, 2010, Mary Ann Case, a mental health case worker, completed a report of psychiatric status, stating that Bennett had angry outbursts, tangential thought processes, difficulty completing tasks, problems maintaining friends or employment, some memory issues, difficulty understanding more than very basic instructions, and mild mental retardation, which made it difficult for him to problem solve without getting frustrated and upset. (AR 402-07).

On November 29, 2010, Ryan Oetting, Ph.D., examined Bennett at the request of the Social Security Administration. (AR 410-12). Bennett presented with a somewhat withdrawn

affect, reporting his mood as "depressed and sad"; his thought processes were logical and sequential, and his communication was on task. (AR 410). He reported that he had abused substances from age 15 to 41, but he had stopped consuming alcohol and using drugs six years ago; Dr. Oetting noted, however, that the Northeastern Center's records reflected that Bennett admitted to getting drunk in early 2009. (AR 410). Dr. Oetting thought Bennett appeared to be in the borderline range of intellectual functioning or possibly had mild mental retardation. (AR 410).

On a mental status exam, Bennett was unable to interpret proverbs, but he could perform simple math problems. (AR 410). He reported irritability, restlessness, and difficulty with concentration, but he denied suicidal ideation. (AR 412). Dr. Oetting found that Bennett's history of impulsivity, erratic behavior, and depressive symptoms met the criteria for bipolar disorder. (AR 412). He also thought that Bennett was still at risk for alcohol abuse. (AR 412). Dr. Oetting considered Bennett's sister's statement that when their parents were taking care of him and he had an employer (Halex) that was sensitive to his emotional needs, he was a good worker. (AR 412). Dr. Oetting assigned Bennett a GAF of 51 and diagnosed him with bipolar disorder NOS; alcohol dependence, sustained full remission per self-report; rule-out learning disorder; and rule-out mental retardation. (AR 412). He concluded that Bennett did "not currently appear to be capable of maintaining employment." (AR 412).

On December 15, 2010, Candace Martin, Psy.D., examined Bennett at the request of the Social Security Administration. (AR 452-55). Dr. Martin observed that Bennett was well-oriented and in good contact with reality, with no evidence of a thought disorder; his attention and concentration were adequate. (AR 453). His mood was normal to the situation, and his

affect was appropriate to his mood; his social skills were intact, and he was cooperative with the examiner. (AR 453).

Dr. Martin administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), the results of which indicated that Bennett was functioning in the borderline range of intelligence with the following scores: verbal comprehension, 68; perceptual reasoning, 86; working memory, 92; processing speed, 65; and full-scale IQ, 73. (AR 454). Dr. Martin wrote that generally speaking, Bennett's verbal comprehension skills and processing speed were in the mild mentally handicapped range, his perceptual reasoning in the low average range, and his working memory in the average range. (AR 454). She opined that, given Bennett's measured intellectual functioning, he "would be most appropriate for a job that required only simple, routine, and repetitive work that did not require strong verbal skills." (AR 454). Dr. Martin assigned Bennett a GAF of 55 and diagnoses of alcohol dependence, in remission; mood disorder, NOS; and borderline intellectual functioning. (AR 455).

On December 21, 2010, Bennett saw Viann Ellsworth, a psychiatric nurse at Park Center, reporting that the medication was helping but that he was "still kind of touchy." (AR 487). On a mental status exam, he exhibited a depressed and irritable mood, helpless thought content, impaired recent memory, withdrawn behavior, and blunted affect. (AR 487-89). She increased his dosage of Celexa. (AR 490). A treatment plan review in January reflected the same diagnoses and GAF score of 46 that were assigned at Bennett's initial evaluation at Park Center; Bennett continued to display symptoms of depression and anger. (AR 553).

On January 25, 2011, J. Gange, Ph.D., a state agency psychologist, reviewed Bennett's record, completing a psychiatric review technique and a mental residual functional capacity

("RFC") assessment. (AR 468-80). On the psychiatric review technique, Dr. Gange found that Bennett had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and a mild restriction in daily living activities. (AR 478). On the mental RFC assessment, Dr. Gange found that Bennett was moderately limited in the following mental activities: understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, interacting appropriately with the general public, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, responding appropriately to changes in the work setting, and setting realistic goals or making plans independently of others. (AR 483-84).

In his narrative, Dr. Gange specifically noted Bennett's 16-year history of factory work that ended for non-psychological factors, that he completed all tasks that are asked of him by the homeless shelter staff and was appropriate and pleasant in his interactions, and that his adaptive functioning was reported as somewhat higher by the shelter staff who have three years of experience working with him. (AR 484). Ultimately, Dr. Gange gave only "[p]artial weight" to the opinions from Park Center and concluded that Bennett was "capable of unskilled task completion in settings that minimize prolonged public contact." (AR 484). His opinion was later affirmed by another state agency psychologist, Joseph Pressner, Ph.D. (AR 540).

In March 2011, Bennett reported to Ms. Ellsworth that his medications were "working ok," but that he still felt "touchy" and had difficulty sleeping. (AR 565). On a mental status exam, he exhibited a depressed and irritable mood; helpless, worthless, and hopeless thought content; and impaired recent memory, withdrawn behavior, and blunted affect. (AR 565-67). In April 2011, Bennett told Ms. Ellsworth that although he still had angry outbursts, they were not

as bad as they had been; a mental status exam was normal.  (AR 553-55).  The treatment plan reflected the prior diagnoses and GAF score of 46, but indicated that Bennett's depressive symptoms were improving.  (AR 550).

Bennett reported similar symptoms to Ms. Ellsworth in July 2011—that he easily became tearful, irritable, and depressed; had problems getting along with others; and had difficulty sleeping.  (AR 577).  She recorded similar clinical signs as at prior visits.  (AR 577-79).  A treatment plan update reflected the same diagnoses and GAF score of 46, but stated that his depressive symptoms were much improved and that he was better able to handle his anger outbursts.  (AR 586-89).

In September 2011, Bennett reported that he was still "touchy," but that an increase in medication had helped somewhat.  (AR 648).  A mental status exam was normal other than depressed mood, impaired recent memory, and difficulty sleeping.  (AR 648-49).  In October 2011, Bennett told Ms. Ellsworth that Paxil was not working well for his anger or depression. (AR 630).  His mental status exam reflected a depressed and angry mood; paranoid, helpless, worthless, and hopeless thought content; suicidal ideation; and impaired memory.  (AR 631-32).

In November 2011, Bennett again complained to Ms. Ellsworth that Paxil was not working, as he felt depressed and was verbally exploding at his family.  (AR 692).  The results of a mental status exam were similar to his last visit.  (AR 693-94).  Ms. Ellsworth decided to discontinue the Paxil and prescribe Cymbalta and Seroquel.  (AR 696).  In December, Bennett's treatment plan reiterated the same diagnoses and GAF score of 46, but his anger management had improved with medications.  (AR 683).  It further reflected that Bennett at times reported feeling angry and wanting to hurt people, but he always clarified that he did not mean it and

would never hurt anyone.  (AR 683).  He continued to exhibit depressive symptoms, including lack of motivation and feeling sad, worthless, and hopeless.  (AR 683).  The treatment plan stated that he was working with his doctor to change some of his medications to lessen some of these symptoms.  (AR 683).  In January 2012, Bennett's mental status report was normal other than impaired recent memory.  (AR 675-76).

On March 1, 2012, Ms. Ellsworth completed a medical source statement on Bennett's behalf.  (AR 710-12).  She listed his symptoms as recent memory problems, depression, easily overwhelmed, and feeling helpless, hopeless, and worthless.  (AR 710).  She stated that he has made minor improvements at times, but has never been free of moderate to severe symptoms.  (AR 710).  She elaborated that although Bennett had recently reported good control of his emotions, this had not been the case over the past year and he likely would have been terminated from a job due to his verbal outbursts.  (AR 711).  She wrote that Bennett frequently is unable to deal with being around other people, angers easily, and does not accept criticism well; she thought that once angry, he would likely walk off the job or miss work, estimating that he would miss more than three days of work a month due to his mental illness.  (AR 711).  She also noted that he has difficulty maintaining a steady pace because his attention wanders, and he becomes frustrated when he cannot keep up; she estimated that he could remain on task only 80% to 84% of a workday.  (AR 712).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* (citations omitted). Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. "[A]n affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The ALJ's Decision

On May 29, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 78-90). The ALJ noted at step one of the five-step analysis that Bennett had worked until October 15, 2009, but that his work activity after the alleged onset date of October 10, 2009, did not constitute disqualifying substantial gainful activity. (AR 80). At step two, the ALJ found that Bennett had the following severe impairments: major depressive

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

disorder, mood disorder, intermittent explosive disorder, alcohol dependence in remission, borderline intellectual functioning, obesity, and minimal degenerative changes in the MP joint of his left great toe. (AR 80). At step three, however, the ALJ concluded that Bennett did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 80).

Before proceeding to step four, the ALJ determined that Bennett's symptom testimony was not credible to the extent it portrayed limitations in excess of the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he is only occasionally able to climb ladders, ropes, and scaffolds. He may frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Based upon a moderate difficulty with concentration, he cannot understand, remember, or carry out detailed instructions and he is limited to redundant tasks that do not require frequent decision-making. In addition, the claimant can tolerate only superficial interaction with supervisors, co-workers, and the public.

(AR 82-83).

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Bennett could perform his past relevant work as a machine feeder, and thus, was not disabled. (AR 88). In addition, the ALJ proceeded to step five, where he concluded that Bennett could also perform a significant number of other medium-work jobs within the economy, including dishwasher, busboy, and industrial cleaner. (AR 89). As a result, Bennett's claims for DIB and SSI were denied. (AR 90).

### C. The ALJ's Consideration of Ms. Ellsworth's Opinion Is Not Supported by Substantial Evidence

First, Bennett argues that the ALJ improperly discounted the March 2012 statement of

Ms. Ellsworth, his treating psychiatric nurse.[5]  Ultimately, the ALJ's rationale for assigning Ms. Ellsworth's opinion "little" weight is not supported by substantial evidence.  (AR 85).

To review, Ms. Ellsworth opined that Bennett made minor improvements at times, but was never free of moderate to severe mental symptoms.  She stated that he angers easily, does not handle criticism well, and would walk off the job when angry; she thought that he would miss more than three days a month due to his mental impairments.  She further opined that Bennett has difficulty maintaining a steady pace due to inattention and that he would become frustrated at falling behind, resulting in his stopping the work task.  She estimated that when performing unskilled work, he could remain on task only 80% to 84% of a workday, which the vocational expert testified is prohibitive of competitive employment.[6]  (AR 60, 710-12).

When considering Ms. Ellsworth's opinion, the ALJ first acknowledged that she was not an "acceptable medical source."  (AR 85).  He then stated: "While Ms. Ellsworth's opinion is given weight to the extent that the claimant's difficulties limit him to superficial contact and

---

[5] Bennett argues that the ALJ should have evaluated this opinion as from a non-examining physician, because it was countersigned by Dr. Lambertson.  But the ALJ was correct to consider the medical source statement as an opinion from Ms. Ellsworth, rather than Dr. Lambertson.  A physician does not become a treating source simply because a nurse practitioner fills out a form "in collaboration with a supervising doctor." *Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) (concluding that where there is no evidence that the physician "ever examined [the claimant]—let alone treated him[,]" it is not considered a treating source opinion); *see Elliot v. Colvin*, No. 1:13-cv-90-WTL-DML, 2014 WL 1018053, at *3-4 (S.D. Ind. Mar. 17, 2014) (holding that a physician's countersignature on a social worker's evaluation did not qualify it as a treating source opinion where the physician never saw the claimant or consulted with the social worker in conducting the evaluation).

Here, Bennett does not suggest that Dr. Lambertson examined or treated him.  Rather, it appears that Ms. Ellsworth's opinion "simply had to be countersigned by either a physician or psychologist, and therefore, [Dr. Lambertson] counter-signed the document." *Elliot*, 2014 WL 1018053, at *3; *see Cooper v. Astrue*, No. 1:06-cv-1175-J DT-TAB, 2007 WL 2904069, at *3 (S.D. Ind. Sept. 27, 2007) (rejecting claimant's assertion to treat a nurse practitioner's opinion that was countersigned by a doctor as a treating source opinion where there was no evidence the doctor saw the claimant or consulted with the nurse about the assessment).  "[D]espite the counter-signature, the assessment is from [Ms. Ellsworth], a nurse practitioner, and not an accepted medical source." *Cooper*, 2007 WL 2904069, at *3; *see also Elliot*, 2014 WL 1018053, at *3.

[6] The vocational expert testified that for an individual to maintain competitive employment, he must incur no more than one or two absences per month (and no more than 10 in a year) and must stay on task 90% of the time, outside of normal breaks.  (AR 60).

non-detailed, repetitive work without frequent decision making, her statements about absenteeism and time off task are given less weight than the opinions [of Dr. Martin and the state agency psychologists]." (AR 85). The ALJ explained that he found Dr. Martin's and the state agency psychologists' opinions "more consistent than [the opinions of Ms. Ellsworth, Ms. Case, and Dr. Oetting] with the claimant's activities and the objective medical evidence of record . . . ." (AR 85). He then assigned Ms. Ellsworth's opinion "little" weight. (AR 85).

Bennett agrees that Ms. Ellsworth is not an acceptable medical source under the applicable regulations. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing acceptable medical sources); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (stating that nurse practitioners are not "acceptable medical sources"). But the fact that Ms. Ellsworth is an "other source" under the regulations "says nothing itself as to why [her opinion is] only entitled to little weight." *Hampton v. Colvin*, No. 12 C 9300, 2013 WL 6577933, at *6 (N.D. Ill. Dec. 13, 2013) (remanding the case based on the ALJ's reasoning with respect to the nurse practitioners' opinions, recognizing that the role they played took on special significance because they provided a very large proportion of the claimant's care). "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." SSR 06-03p, 2006 WL 2329939, at *5. "As SSR 06-03p recognizes, the growing importance of managed care means that nurse practitioners play an increasingly large role in treating patients who would otherwise be seen by physicians or other acceptable medical sources." *Hampton*, 2013 WL 6577933, at *6.

As such, "an ALJ may not reject a [nurse practitioner's] report *solely* because [nurse

practitioners] are not considered acceptable medical sources." *Courtney v. Colvin*, No. 11-CV-176-WMC, 2014 WL 218219, at *5 (W.D. Wis. Jan. 21, 2014); *see Frame v. Astrue*, No. 1:11-cv-01062-WTL-MJD, 2012 WL 3637583, at *9 (S.D. Ind. Aug. 21, 2012) (remanding case where the ALJ rejected the nurse practitioner's opinion on the sole basis that she was an "other source"); *Garcia v. Astrue*, No. 1:11-CV-00165, 2012 WL 3137890, at *12 (N.D. Ind. Aug. 1, 2012) (remanding case where the ALJ articulated at the outset that the nurse practitioner's opinion was worthy of less weight and then upon evaluating the opinion, discounted it on at least one basis that was "suspect"). Therefore, the other reasons provided by the ALJ—that Ms. Ellsworth's opinion is inconsistent with Bennett's activities and the objective medical evidence of record—must adequately support the discounting of Ms. Ellsworth's opinion in order to affirm his decision.

1. Daily Living Activities

With respect to Bennett's daily activities, the ALJ considered that Bennett used to be homeless, but now lives independently in an apartment that he obtained with Park Center's help. (AR 83, 86). He performs his own basic household tasks and self care, though at times he exhibits poor hygiene. He rides his bike to visit his sister, shop for groceries, and pick up cans; he then takes the cans to the recycling center and exchanges them for cash, which he manages on his own. He also plays pool, pinball, and hand-held games; uses a computer to talk with friends; and goes to church. (AR 85).

The ALJ did not explain, however, nor is it obvious, how these rather minimal daily activities—all performed at Bennett's own pace—contradict Ms. Ellsworth's opinion that he will miss more than three days of work a month, become overwhelmed and frustrated with even

unskilled work, and be unable to maintain a pace necessary for competitive employment. As the

Seventh Circuit Court of Appeals explained on one occasion:

> It's not that daily activities are never relevant (if a claimant with a supposed bad back was hanging drywall as a side business, or if a supposed depressed and socially adverse client was the head of her child's PTA and taught music lessons, the contradictions might be obvious); rather, the ALJ simply must show his work. He must show why the activities contradict the claim. Here, the ALJ did not explain why activities such as visiting family, shopping, and going to church contradict the conclusion of [a disabling] mental impairment by [health care providers] examining the same lifestyle.

*Gaylor v. Astrue*, 292 F. App'x 506, 514 (7th Cir. 2008); *see Mueller v. Astrue*, 493 F. App'x

772, 777 (7th Cir. 2012) (remanding decision where the ALJ did not explain perceived

inconsistencies between a claimant's daily activities and the medical evidence, stating that it was

"certainly not obvious how the very minimal activities [the claimant] described contradict a

claim of a disabling mental disorder").

The Seventh Circuit has "urged caution in equating [daily] activities with the challenges

of daily employment in a competitive environment . . . ." *Beardsley v. Colvin*, 758 F.3d 834, 838

(7th Cir. 2014) (citations omitted). "The pressures, the nature of the work, flexibility in the use

of time, and other aspects of the working environment as well, often differ dramatically between

home and office or factory or other place of paid work." *Mendez v. Barnhart*, 439 F.3d 360, 362

(7th Cir. 2006).

The record reflects that Bennett lived with his parents until age 30, never got a driver's

license, and that his parents took care of him, at least to some extent, even after he married and

had children. (AR 304 ("He always had them to make up for everything he couldn't do on his

own."), 307). Although the ALJ considered that Bennett worked at Halex for 16 years (AR 35),

the ALJ did not acknowledge that his mother got him the job, worked in the same department as

him, transported him to and from work, and looked out for him during the workday. (AR 304; *see* AR 412 ("[W]hen his parents were taking care of him and his employer was sensitive to his emotional needs, he was a good worker."). His father has now passed away, and Bennett's mother can no longer support him to the extent she and her husband did in the past. (AR 253).

The Seventh Circuit has explained that "holding a job for a prolonged period of time does not preclude a finding of disabling impairments." *Stuart v. Colvin*, No. 14 C 1597, 2015 WL 3791755, at *5 (N.D. Ill. June 18, 2015). That is, "employment alone 'is not proof positive of ability to work, since disabled people, if desperate, or employed by an altruist, can often hold a job.'" *Id.* (quoting *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998)).

Moreover, "[t]he ALJ's assumption that [Bennett's] past work undercuts his present claim of disability also seems to rest on the obviously incorrect proposition that mental illness that was not disabling in the past automatically cannot worsen later. We have observed that mental illness does not always follow a predictable trajectory." *Mueller*, 493 F. App'x at 776 (citations omitted).

In that regard, at his most recent job, Bennett's boss wanted him to go faster, but he could not keep up the pace, broke down crying, and quit within three months. (AR 33-34, 242, 258, 268, 312). It is unclear why Bennett quit his job before that, but there he lasted just eight months. (AR 88, 242). As stated earlier, Ms. Ellsworth opined that Bennett's anger and concentration problems would likely cause him to become frustrated and overwhelmed even with unskilled work, resulting in his giving up the job or not showing up for work. (AR 711-12). Thus, Bennett's recent work history and his daily activities are not necessarily inconsistent with Ms. Ellsworth's opinion. *See Strobach v. Colvin*, No. 12 CV 50012, 2014 WL 1388285, at

*12 (N.D. Ill. Apr. 9, 2014) (finding that the ALJ erred by discounting the nurse practitioner's opinion because of alleged inconsistencies, but did not explain what actual inconsistencies existed in the record).

## 2. Objective Medical Evidence

The ALJ also fails to adequately explain how the objective medical evidence listed by Park Center is inconsistent with Ms. Ellsworth's opinion. In summarizing this evidence, the ALJ stated:

> Mental status examination findings were generally unremarkable, *except for* unkempt appearance at times, agitation, angry mood, helpless and hopeless thought content, impaired memory, blunted affect, withdrawn behavior, concrete thoughts, slow behavior, distractibility, immaturity, poor insight and judgment, depressed and anxious mood, difficulty repeating digits forward and backward, paranoia at times, and rigid thinking. He usually denied feeling suicidal. He admitted that he threatened suicide when he felt upset or angry but did not mean it. Improvement was noted at times in the claimant's anger management skills and depression.

(AR 87) (emphasis added) (citations omitted).

The ALJ's lengthy list of exceptions defies his characterization of Bennett's mental status examination findings as "generally unremarkable." The ALJ does not explain how these findings are insufficient to support Ms. Ellsworth's opinion that Bennett would likely miss more than three days of work a month and stay on task only 80% to 84% of the workday. As stated earlier, the vocational expert testified that an individual cannot maintain competitive employment if he incurs more than one or two absences a month or stays on task less than 90% of the time. (AR 60); *see Johnson v. Astrue*, No. 11 CV 6668, 2012 WL 5989284, at *11 (N.D. Ill. Nov. 29, 2012) ("[A]n ALJ cannot rely solely on the claimant's or doctor's hopeful remarks made during better days, but must consider whether the claimant can hold a job even on low

days." (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)); *see also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[B]ipolar disorder is episodic.").

To reiterate, the ALJ *"must build an accurate and logical bridge from the evidence to his conclusions." Clifford*, 227 F.3d at 872 (citations omitted). Here, the ALJ failed to do so with respect to his discounting of Ms. Ellsworth's opinion, and thus, the Commissioner's final decision will be remanded.

### D. The ALJ's Consideration of Dr. Oetting's Opinion Is Not Supported by Substantial Evidence

Bennett also argues that the ALJ's decision to assign "little" weight to the opinion of Dr. Oetting, a physician who examined him at the request of the Social Security Administration, is not supported by substantial evidence. (AR 84). The Court agrees that the reasons provided by the ALJ to discount this opinion are unpersuasive.

At the November 2010 mental status examination, Dr. Oetting concluded that Bennett's history of impulsivity, erratic behavior, and depressive symptoms met the criteria for bipolar disorder, and thus, he assigned Bennett that diagnosis, as well as diagnoses of alcohol dependence, sustained full remission; rule-out learning disorder; and rule-out mental retardation. (AR 412). He also gave Bennett a current GAF score of 51. (AR 412). Ultimately, Dr. Oetting opined that Bennett did not currently appear capable of maintaining employment. (AR 412).

As the ALJ observed, Social Security Ruling 96-5p states that an opinion from a medical source that a claimant is unable to work is an administrative finding reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996). As such, the opinion is not entitled to controlling weight or given special significance, but it also must not be disregarded. *Id*. Here, the two reasons provided by the ALJ for assigning little weight to Dr. Oetting's

opinion—which was requested by the Social Security Administration and fairly consistent with the opinions of Bennett's treating practitioners—do not withstand scrutiny.

First, the ALJ indicated that Dr. Oetting's opinion was inconsistent with the GAF score of 51 that he assigned at the mental status exam. (AR 84). "[A]lthough an ALJ is not required to determine the extent of a claimant's disability based on [his] GAF score, *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), in this case the ALJ instead relied on a misunderstanding of the GAF score." *Goble v. Astrue*, 385 F. App'x 588, 594 (7th Cir. 2010). A GAF score of 51 to 60 suggests moderate difficulties in occupational functioning, *see* note 3 *supra*, and "a score below 51 indicates a possible inability to keep a job," *Goble*, 385 F. App'x at 594 (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32-35 (Text Revision, 4th ed. 2000)).

The Seventh Circuit stated on at least one occasion that a GAF score of 58—seven points higher than Dr. Oetting's score of 51—"is not inconsistent with difficulty tolerating stress but rather suggests someone who may be barely above the level of being able to work or live independently." *Goble*, 385 F. App'x at 594; *see also Pontarelli v. Colvin*, No. 13 C 1015, 2014 WL 3056616, at *5 (N.D. Ill. July 7, 2014) (noting that an even higher GAF of 60 can be insufficient for discounting a bipolar claimant's marked limitations under certain conditions (citing *Sambrooks v. Colvin*, 566 F. App'x 506, 511 (7th Cir. 2014)); *Granados v. Astrue*, No. 09 C 7600, 2011 WL 746285, at *7 (N.D. Ill. Feb. 24, 2011) (finding that a GAF of 55 "was just barely at a level suggesting someone could work or live independently," and that it did not really contradict the opinion of the claimant's treating psychiatrist and therapist that the claimant, who was bipolar, could not work). Furthermore, the GAF score assigned by Dr. Oetting was a

"current" GAF score.  (AR 412).  "[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition."  *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (collecting cases).

Second, the ALJ assigned little weight to Dr. Oetting's opinion because "Dr. Oetting questioned whether or not the claimant was fully forthcoming with him."  (AR 84).  In that regard, Dr. Oetting noted three potential discrepancies in Bennett's reporting: (1) he mentioned only two past criminal charges, but the Northeastern Center's records suggested that he had a third; (2) although he stated that he had not consumed any alcohol in six years, the Northeastern Center's records reflect that he had done so in early 2009; and (3) his sister stated that he would not admit to suicidal thoughts for fear of involuntary hospitalization.  (AR 410, 412).

The Court, however, cannot trace the ALJ's logic in discounting Dr. Oetting's opinion based on this information.  *See Clifford*, 227 F.3d at 874 (stating that the Court "must be able to trace the ALJ's path of reasoning" (citation omitted)).  Obviously Dr. Oetting was aware of Bennett's inaccuracies because he noted them in his report.  Yet, Dr. Oetting *still* concluded that Bennett was unable to maintain competitive employment, suggesting that he viewed Bennett's reporting inaccuracies as either immaterial or, in the case of Bennett's reluctance to admit suicidal thoughts, as supportive of disability.

Accordingly, the ALJ is directed to re-examine Dr. Oetting's opinion upon remand.

### E.  The State Agency Psychologists Relied on Evidence Not of Record

The ALJ ultimately assigned "more weight" to the opinions of the state agency psychologists, Drs. Gange and Pressner, as well as the opinion of Dr. Martin.  (AR 85).  Bennett argues that the ALJ's decision to do so is not supported by substantial evidence because Drs.

Gange and Pressner relied on evidence that is not in the administrative record.

These doctors explained that they gave just "[p]artial weight" to Park Center's opinions because Bennett's "adaptive functioning is reported to be somewhat higher by the [homeless] shelter staff who have 3 years of experience with [him]." (AR 484). The doctors further stated: "Shelter staff reported that [Bennett] completes all tasks that are asked of him and engages in appropriate and pleasant social interactions with others." (AR 484). Drs. Gange and Pressner then concluded, in reliance on the statements from the homeless shelter staff and Bennett's 16-year work history at Halex, that Bennett was "capable of unskilled task completion in settings that minimize prolonged public contact." (AR 484).

But as Bennett argues, there are no reports or statements from the homeless shelter staff in the administrative record. As such, the Court cannot determine whether those reports or statements actually support the state agency psychologists' opinion, to which the ALJ assigned more weight. Therefore, the Commissioner is directed to address this evidentiary deficit upon remand.[7] *See* 42 U.S.C. § 406(g) ("As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."); *Pierce v. Astrue*, No. 1:10-cv-01451-SEB-MJD, 2012 WL 1035020, at *7 (S.D. Ind. Mar. 27, 2012) (remanding the Commissioner's final decision where certain evidence was referenced by the ALJ in his decision, but was omitted from the administrative transcript submitted to the Court).

---

[7] Because a remand is warranted based on the arguments discussed herein, the Court need not reach Bennett's remaining arguments.

**V. CONCLUSION**

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Bennett and against the Commissioner.

SO ORDERED.

Enter for this 17th day of September 2015.

s/ Susan Collins
Susan Collins
United States Magistrate Judge